**John GAUTIERI, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C.A. 00–053–L.**

United States District Court, D. Rhode Island.

Sept. 19, 2001.

Paul DeMarco, Geremia & DeMarco, Providence, RI, Bennett J. Bergman, Pawtucket, RI, for Plaintiff.

Anthony C. DiGioia, U.S. Attorney's Office, Providence, RI, for Defendant.

## DECISION AND ORDER

LAGUEUX, District Judge.

Plaintiff John Gautieri filed the instant action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1994), alleging medical malpractice by physicians at the Veterans Administration Medical Center in Providence, Rhode Island (hereinafter the "VA"). On December 5, 1996, plaintiff underwent surgery to implant an inflatable penile prosthesis. Following the implant surgery, plaintiff developed a bulge on the left side of his penis, and complained of constant pain in the area of his penis and scrotum. As a result, plaintiff underwent a second surgical procedure to remove the prosthesis on

February 27, 1997. Plaintiff alleges that physicians at the VA deviated from the standard of care during the implant surgery and also during plaintiff's post-operative care. A bench trial was held from June 11, 2001 to June 18, 2001. This Court is now prepared to render a decision.

## I. Legal Standard

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. Fed. R.Civ.P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon." *Id.* It is within the purview of this Court to weigh the credibility of witnesses for the purpose of making findings of fact. *See id.*

## II. Applicable Law

■ The FTCA is a waiver of the United States' immunity from lawsuits sounding in tort. 28 U.S.C. § 1346(b). The FTCA provides that "[t]he United States shall be liable ... to the same extent as a private individual under like circumstances" for torts of its employees acting within the scope of their employment. 28 U.S.C. §§ 1346(b), 2674. In determining the manner and extent to which the United States may be liable, "the law of the place the act or omission occurred" must be applied. 28 U.S.C. § 1346(b); *Soto v. United States,* 11 F.3d 15, 17 (1st Cir.1993). Therefore, Rhode Island medical malpractice law governs the present dispute.

■ As in any other negligence action, a plaintiff pursuing a medical malpractice claim must prove by a preponderance of the evidence that: (1) the defendant had a duty to act or to refrain from acting, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's injuries. *See Schenck v. Roger Williams Gen. Hosp.,* 119 R.I. 510, 119 R.I. 935, 382 A.2d 514, 516–17 (1977).

■ Under Rhode Island law, physicians are "under a duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class to which he or she belongs, acting in the same or similar circumstances." *Sheeley v. Memorial Hosp.,* 710 A.2d 161, 167 (R.I.1998). This standard of care also applies to resident physicians. *Baccari v. Donat,* 741 A.2d 262, 264 (R.I. 1999). A physician is not under a duty to cure the patient, *Schenck,* 119 R.I. 510, 119 R.I. 935, 382 A.2d at 517, nor does a physician guarantee a successful course of treatment, *Young v. Park,* 417 A.2d 889, 893 (R.I.1980).

■ Unless the lack of care rendered by a physician is so obvious as to be a matter of common knowledge, Rhode Island law requires that the standard of care be established through expert testimony. *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676, 682 (1972). Likewise, any deviation from the standard of care must also be established through expert testimony. *Id.* With this framework in mind, the Court proceeds to evaluate plaintiff's claim.

## III. Findings of Fact

Plaintiff was born on September 18, 1935. He served in the Armed Forces during the Korean War, and was honorably discharged from the Army in 1957. Plaintiff has been unemployed since June of 1967, when he ruptured a disk in his lower back while working as a nuclear quality control inspector at Electric Boat. As a result of this back injury, plaintiff underwent four separate back surgeries: the first to remove the ruptured disk, the second to fuse vertebrae, the third to remove scar tissue, and the fourth for place-

ment of a TENS unit (transcutaneous electronic nerve stimulator) in his back in an attempt to short circuit pain impulses to his brain. In addition to his back surgeries, plaintiff's right lung was removed in 1991 as a result of lung cancer.

In late 1990, plaintiff presented to the VA General Medicine division, complaining of pain in his lower back. At the time of this visit, plaintiff indicated that he wished to transfer his medical care to the VA, explaining that he could no longer afford his medications and that his current physicians refused to prescribe additional medications for his back pain. Thereafter, plaintiff received his medical care from physicians at the VA.

In January of 1994, plaintiff requested a consultation with the Male Reproductive/Urology division. During this consultation, plaintiff stated that he was unable to achieve a full erection, and could not maintain an erection for more than one or two minutes. Plaintiff also indicated that he had been experiencing some degree of erectile dysfunction for approximately five years. Thereafter, plaintiff was diagnosed with organic impotence, most likely the result of a vascular problem involving an insufficient blood flow in the corporal tissue of the penis.

Two treatments were suggested for plaintiff's erectile dysfunction: (1) a pump called a vacuum correction device or vacuum constriction device, or (2) penile injection therapy. Plaintiff opted to try the pump first, but this method failed. Accordingly, plaintiff began using penile injections, which entails injecting medication into the penile tissue that induces an erection by increasing blood flow. In many instances, penile injections are effective initially, but lose their potency over time. This proved to be true in plaintiff's case.

By October of 1995, plaintiff developed a plaque at the base of his penis, a side effect of the penile injections. At this point in time, plaintiff discussed the possibility of penile implant surgery with physicians at the VA. Plaintiff reviewed literature on the different types of penile prostheses, and eventually chose to have a type of penile implant referred to as malleable rods. However, plaintiff was ultimately persuaded to choose a different type of implant, the Mentor Alpha I inflatable penile prosthesis ("the prosthesis"), which has a more natural appearance than malleable rods when the penis is in the flaccid state. This prosthesis is comprised of three components: (1) a pump, (2) a reservoir, and (3) two cylinders.

Before reaching the specific facts of plaintiff's surgery, it is appropriate to provide a general description of the steps involved in implanting an inflatable penile prosthesis. The patient is positioned on his back, with the penis lying on the patient's abdomen in the flaccid state. The surgeon begins the procedure by making an incision into the penis. A penoscrotal incision is commonly made, which is on the underside of the penis where it joins the scrotum. The penoscrotal approach is favored because there are fewer nerves in this area of the penis, resulting in less discomfort to the patient during the healing process. Once the incision is made, the surgeon continues to dissect the tissue to the left and to the right until the corpora cavernosa are visible. The corpora cavernosa are two cylindrical bodies which hold the corporal tissue involved in erections. The corpora extend the length of the penis, from just underneath the head of the penis back towards the pubis.

In order to reach the corpora, it is necessary to cut through two separate layers of tissue that surround the corpora cavernosa. The first layer, called Buck's fascia, is a thin fibrous layer of tissue that surrounds the corpora cavernosa as well as

the urethra. The second layer, called the tunica albuginea, is a hard coating that lies underneath the Buck's fascia and surrounds the corpora cavernosa. After an incision is made through Buck's fascia and the tunica albuginea, the spongy tissue of the corpora becomes visible. This step is taken for both the left and right corpora, and stay sutures are placed at the beginning and end points of the two incisions.

At this point, the surgeon dilates the corpora cavernosa in order to create space for the cylinder components of the prosthesis. Because inflatable penile prostheses are available in different lengths and widths, it is imperative that the surgeon take an accurate measurement of the diameter and length of each corpora in order to fit the patient with the appropriate prosthesis. There are several methods of measuring the diameter of the corpora, but the most common method is to insert a metal rod called a Hagar dilator. Hagar dilators are calibrated, and the surgeon may insert progressively larger dilators until there is sufficient space for the cylinder components of an implant. Because the penoscrotal incision is essentially made at the midpoint of the corpora cavernosa, the corpora is dilated in two directions: (1) distally, in the direction away from the body, and (2) proximally, in the direction of the pubis.

After the surgeon obtains an accurate measurement of the diameter of each corpora, he or she must measure the length of each corpora. For this measurement, a metal rod marked in centimeters is inserted into the space created by the Hagar dilator. Measurements are taken distally and proximally for each corpora, and the surgeon typically uses the stay sutures as the markers used for each measurement. Because the penis is stretchy, these measurements are taken while the penis is extended, but not vigorously stretched.

The proximal and distal measurements are then added together, along with measurement of the space between the stay sutures (usually one centimeter) at the incisions into the corpora, to calculate the length of each corpora cavernosum.

Once the size of the appropriate prosthesis has been determined, it is inserted into the penis. In most cases, all three components of the prosthesis can be inserted through the penoscrotal incision. The pump is placed in the scrotum, the reservoir is placed in an area of the pubis called the space of Retzius, and the cylinders are placed into the corpora cavernosa. After the prosthesis is inserted, the surgical team assesses how well the prosthesis fits by looking at the penis with the prosthesis deflated and inflated before the corpora is closed, and then again after the corpora is closed.

The Court now turns its attention to plaintiff's implant surgery. Plaintiff was admitted to the VA for insertion of the prosthesis on December 5, 1996. The VA is a teaching hospital affiliated with Brown University Medical School. It is standard that residents participate in the care provided to a patient at a teaching hospital. Accordingly, plaintiff's surgical team included Dr. Mark Sigman ("Dr. Sigman"), the attending physician; Dr. Louis Wojcik ("Dr. Wojcik"), a senior resident in his last year of urological training; and Dr. William Swanson ("Dr. Swanson"), a junior resident who was observing a penile implant surgery for the second time.

Dr. Sigman has been employed by the Surgical Service Subdivision of Urology at the VA since 1989. When performing a surgical procedure with the residents, Dr. Sigman wears two hats; he is both surgeon and teacher. As the attending physician, Dr. Sigman is in charge of the surgery and is responsible for the results of the surgery. As such, it is Dr. Sigman's

standard practice to be present throughout the surgical procedure and to check all work performed by the residents. Primarily, it is the senior resident that will perform the surgery with the attending physician. In some cases, a junior resident may participate in the surgery by making the initial incision. However, it is much more common for the junior resident to simply observe the surgery and record data for the operative report.

Dr. Sigman and Dr. Swanson were both called to testify by plaintiff. However, neither Dr. Sigman nor Dr. Swanson had an independent memory of the implant surgery. Therefore, their testimony reflects their review of the VA records. In addition, Dr. Sigman testified about his usual practices when performing a penile implant surgery.

Plaintiff's surgery began with the surgeons making a penoscrotal incision into the penis. After making incisions into the left and right corpora, stay sutures were placed in each corpora at the site of the incisions. The incisions into the right and left corpora were both approximately one centimeter long, with stay sutures going in at one end of each incision and coming out at the opposite end of each incision. At this point, the right and left corpora were measured in the distal and proximal directions.

Dr. Sigman explained that it is his standard practice to stand on one side of the patient and have the resident stand on the other side of the patient, with both persons participating in the procedure. Because the penis is stretchy, they will take more than one measurement of each corpora, and commonly write these measurements down on the surgical drapes with a sterile pen. In some cases, Dr. Sigman lets the resident take the first measurement, and then he takes the second. In addition, another measurement may be taken while Dr. Sigman and the resident both have their hands on the dilator.

The measurements of plaintiff's right and left corpora both produced a distal measurement of ten centimeters and a proximal measurement of nine centimeters. Because the stay sutures are used as a reference point for taking the measurements, the total length of each corpora was twenty centimeters, the sum of the centimeter between the stay sutures and the distal and proximal measurements. Based on these measurements, an inflatable penile prosthesis with cylinders measuring eighteen centimeters long was selected. Rear tip extenders measuring two centimeters long were then placed on the proximal ends of each cylinder to create a prosthesis with cylinders measuring twenty centimeters long.

These measurements were recorded in two separate places. Dr. Wojcik recorded them in a brief operative note, writing that the right and left cylinders measured eighteen centimeters and that rear tip extenders measuring two centimeters were also used on each cylinder. This measurement was also recorded by Dr. Sigman in his operative note, which notes that an Alpha I prosthesis measuring "18 + 2" centimeters was implanted during surgery. However, the use of rear tip extenders was not noted in the typed operative report dictated by Dr. Swanson. In that report, Dr. Swanson records the distal measurement of nine centimeters and a proximal measurement of ten centimeters, and states that a prosthesis measuring eighteen centimeters was implanted during surgery.

Before the cylinders were implanted into the corpora cavernosa, the reservoir was inserted through the penoscrotal incision and the inguinal canal into the space of the Retzius. The cylinders were then inserted into the corpora, and the prosthesis was inflated. When the prosthesis was inflat-

ed, the surgeons noted that a good erection, adequate for sexual function, was produced. Although the penis deviated mildly to the right, the deviation was not so severe as to hinder sexual function and did not concern Dr. Sigman. Next, the incisions into the corpora were closed. The pump was placed into the scrotum and the tubes connecting the pump and reservoir were attached. After installing all three components of the prosthesis and closing the corpora cavernosa, the prosthesis was inflated for a second time by pumping fluid therein from the reservoir. This time, there was less of a deviation to the right, and the erection remained adequate for sexual function. The surgeons proceeded to close the incisions made into the subcutaneous tissue as well as the skin. The operative report reflects that "[t]he patient tolerated the procedure well. There were no complications." VA Records, p. 276.

Plaintiff was discharged the following day. He was instructed to keep his penis pointed up towards his chest for one week, and to pull the pump in his scrotum down every day. Plaintiff was given a prescription for codeine, and was told to return to the Urology clinic on December 27, 1996 for a post-operative visit. Plaintiff ·was then driven home by his wife, Vera Gautieri.

On or about December 16, 1996, ten days after his discharge and eleven days prior to his scheduled appointment, plaintiff returned to the VA. There is no record of plaintiff being examined by a VA physician at this time. However, plaintiff filled a prescription on this date for 30 tablets of codeine which was written by Dr. Wojcik.

Plaintiff next visited the Urology clinic for his scheduled appointment on December 27, 1996. He was examined by Dr. Leslie Tackett ("Dr. Tackett–McQuiston"),

a resident at the VA.[1] Plaintiff complained to Dr. Tackett–McQuiston that he was still sore when sitting, and reported that he was not using the prosthesis yet. He did not complain of any other pain. While examining plaintiff, Dr. Tackett–McQuiston noticed a bulge on the left side of plaintiff's penis, which was visible in the flaccid state. Because this was the first time she had seen such a bulge, Dr. Tackett–McQuiston brought Dr. Sigman into the exam room, where he remained for the remainder of plaintiff's exam.

Dr. Tackett–McQuiston continued her examination of plaintiff by inflating the prosthesis. She noted that there was no bruising and that the scrotal wound was healing. Plaintiff stated that he was still sore when sitting, and Dr. Tackett–McQuiston recorded that although plaintiff was mildly to moderately tender around the pump, he had no other complaints. Plaintiff was instructed to return to the Urology clinic in three weeks, at which time the bulge on the left side of plaintiff's penis would be re-evaluated. Dr. Tackett–McQuiston noted in the chart that the bulge could be the result of a kink in the cylinder, and that the need for a revision of the implant would be clearer at plaintiff's next appointment.

On January 17, 1997, plaintiff returned to the Urology clinic for his second post-operative visit. Plaintiff's chart reflects that he was examined by Dr. Becker. Dr. Becker noted that there was a question of a kink in the left cylinder at plaintiff's last visit. Upon examination, Dr. Becker observed an obvious bulging of the prosthesis along the left side of the penis. The bulging was particularly apparent at the peno-pubic junction. When the prosthesis was inflated, Dr. Becker noticed a severe chordee, or bend, to the right. In addition, the

---

**1.** Dr. Tackett has since married, and now uses the name of Dr. Tackett–McQuiston.

prosthesis bulged on both the left and right side when inflated, indicating that the problem with the prosthesis had worsened since plaintiff's last visit. Dr. Becker entered in the chart that plaintiff was very bothered by the scrotal hardware of the prosthesis.

Based on the continued presence of the bulge on the left side of plaintiff's penis and the fact that the scrotal hardware was causing plaintiff discomfort, it was decided that plaintiff's prosthesis should be removed and replaced with malleable rods. The removal and replacement surgery was scheduled to take place on February 27, 1997. Dr. Sigman was scheduled to perform the surgery, assisted by two residents, Dr. Christopher Porter and Dr. Marc Lavine.

On the morning of the removal and replacement surgery, plaintiff decided that he did not want to have the malleable rods installed. Instead, he simply wanted to remove the inflatable penile implant. Dr. Sigman informed plaintiff that it would be very difficult to install a penile implant at a later date, and that plaintiff's decision not to have a replacement prosthesis installed at this time could render him permanently impotent. Plaintiff signed a consent form indicating that he was aware of these risks.

The removal surgery commenced with the reopening of the original penoscrotal incision made during the December 5, 1996 surgery. After a prosthesis is implanted, a fibrous capsule forms around all three components of the prosthesis. Although the prosthesis can usually be installed through one incision, the fibrous capsule prevents the surgeon from removing the reservoir through the point of the initial incision. Accordingly, it is almost always necessary to make an incision into the abdomen in order to remove the reservoir. Plaintiff's case was no exception. After

removing the pump from plaintiff's scrotum through the penoscrotal incision, a second incision was made into plaintiff's abdomen, and the reservoir was removed through this incision. The cylinders were then removed from the corpora through the penoscrotal incision. After the cylinder was removed from the left corpora, Dr. Sigman inserted his finger into the left corpora. Dr. Sigman testified that he felt a "weak thin spot" in the tunica albuginea, which he characterized as an unusual finding. Trial Tr., June 12, 2001, p. 30. The location of the thin spot was lateral to the area of the initial incision into the left corpora. *See id.* Both the operative note and the typed operative report stated that the prosthesis was removed without complications.

On the day following the removal surgery, plaintiff complained of incisional pain. He was discharged from the VA later the same day, and given a prescription for codeine for his pain. Plaintiff was instructed to refrain from any strenuous activity and given an appointment in the VA Urology clinic for April 11, 1997. Plaintiff returned to the Urology clinic on April 7, 1997, four days prior to his scheduled visit. Dr. Becker, who examined plaintiff at this visit, noted that plaintiff continued to complain of incisional pain and that there was scarring present near the corpora and scrotum. However, Dr. Becker noted that the scarring was likely to soften with time. At this visit, Dr. Becker gave plaintiff a prescription for Vicodin, a pain medication.

Plaintiff returned to the Urology clinic two months later on June 9, 1997. Plaintiff was again examined by Dr. Becker on this visit. Dr. Becker's notes reflect that the scarring near the scrotum had softened and resolved since plaintiff's last visit. It was also noted that plaintiff continued to complain of pain at the base of the

penis, and was now experiencing a spraying of his urinary stream along with decreased force in his urinary stream. A cystoscopy was scheduled to determine the cause of the problem with plaintiff's urinary stream. Plaintiff canceled the cystoscopy and did not reschedule the procedure. Plaintiff did not return to the VA Urology clinic after the June 9, 1997 visit.

On November 26, 1997, plaintiff began treating with Dr. Anthony J. Rotelli, Jr. ("Dr. Rotelli"). Plaintiff complained to Dr. Rotelli of pain in his penis and the bottom part of his scrotum, as well as problems with the force and direction of his urinary stream. At some point in time after plaintiff's initial visit with Dr. Rotelli, plaintiff retained Dr. Rotelli as a consultant for purposes of this lawsuit.

Plaintiff filed suit on February 8, 2000. The complaint states two causes of action. Count I alleges a cause of action for medical malpractice resulting from negligent care rendered by physicians at the VA. Count II alleges that the physicians at the VA failed to obtain plaintiff's informed consent for the care rendered to plaintiff. Nevertheless, plaintiff did not pursue the informed consent claim during the course of the bench trial. Accordingly, this Court will only address plaintiff's medical malpractice claims.

IV. Conclusions of Law

During the course of the bench trial, plaintiff pursued two claims for medical malpractice against the VA. First, plaintiff alleged that the physicians at the VA committed medical malpractice during the December 5, 1996 implant surgery. Second, plaintiff alleged that the post-operative care he received at the VA did not conform to the standard of care. In order to prevail on his medical malpractice claims, plaintiff must prove by a preponderance of the evidence that the physi-cians at the VA deviated from the standard of care observed by a reasonably competent physician, acting in the same or similar circumstances. Because Rhode Island law requires that the standard of care and any deviation from the standard of care be established through expert testimony, the Court turns its attention to the expert witnesses and the opinion testimony they provided in this case.

Plaintiff's expert witness, Dr. Anthony J. Rotelli, Jr., received his undergraduate degree from Brown University in 1967 and his medical degree from Creighton University School of Medicine in 1974. Upon graduating from medical school, Dr. Rotelli completed a one year internship in general surgery with Kaiser Hospital in Oakland, California. Dr. Rotelli completed his residency in urology at New Jersey College of Medicine in 1982. He has been board certified in urology since 1982. Dr. Rotelli is a sole practitioner. He is a member of the staff at St. Joseph's Hospital, and is on the consulting staff at both Pawtucket Memorial Hospital and Landmark Hospital.

Defendant's expert witness, Dr. Abraham Morgentaler, graduated from Harvard College in 1978 and from Harvard Medical School in 1982. Dr. Morgentaler completed an internship in surgery through the Harvard Surgical Service at New England Deaconess Hospital in 1983, and completed his residency in surgery through the same program in 1984. Dr. Morgentaler also completed an internship in urology through the Harvard Program in Urology in 1988, serving as Chief Resident during his final year in the program. In addition to his postdoctoral training, Dr. Morgentaler has held several academic appointments. From 1982 to 1988, Dr. Morgentaler was a Clinical Fellow in Surgery at Harvard Medical School. Since 1988, he has instructed medical students at Har-

vard Medical School in urology, and is currently an Associate Clinical Professor of Surgery.

Dr. Morgentaler has been board certified in urology since 1990, with sub-specialties in male infertility and sexual dysfunction. In addition to his private practice, he is an Associate in Urology at Beth Israel Hospital and an Associate Member of the Cancer Center at Beth Israel Deaconess Cancer Center. Dr. Morgentaler has received numerous awards, published numerous medical reports, and has served on the editorial boards or as a reviewer for many medical journals. His professional affiliations and memberships are too numerous to recount here, although the Court does note that he has been a member of the American Urological Association since 1989, and a member of the Society for the Study of Impotence and the Society for the Study of Male Reproduction since 1994.

Although Dr. Sigman was primarily called as a fact witness, he also provided expert opinion testimony. Dr. Sigman is a 1977 graduate of the University of Vermont and a 1981 graduate of the University of Connecticut Medical School. He completed his internship in general surgery at the University of Virginia Hospital in 1982. In 1983, he completed his residency in general surgery at the same facility. From 1983 to 1987, Dr. Sigman was a resident in urology at the University of Virginia Hospital. In 1987, Dr. Sigman received an American Urologic Association Scholarship, and began a two year fellowship in Male Reproductive Medicine and Surgery at Baylor College of Medicine. Dr. Sigman has been board certified in urology since 1991. He is a member of a private practice group, and has hospital appointments at Rhode Island Hospital, Roger Williams General Hospital, Women and Infants' Hospital, Memorial Hospital of Rhode Island, as well as the VA. In addition to his staff appointments, Dr. Sigman is an Associate Professor of Surgery in Urology at Brown University. He is a member of several medical associations, and has served in an executive capacity with the American Urological Association, the American Society for Reproductive Medicine, and the Society for the Study of Male Reproduction. Like Dr. Morgentaler, Dr. Sigman has also published articles and reports too numerous to list here.

On direct examination, Dr. Rotelli testified that the physicians at the VA failed to ensure that the prosthesis was properly installed during the implant surgery on December 5, 1996. Dr. Rotelli testified that this conclusion was based on two factors: (1) the operative report noting a mild deviation to the right upon inflation of the prosthesis, and (2) plaintiff's statement that he noticed a bulge on the left side of his penis almost immediately after the surgery.

Dr. Rotelli's gave his opinion that there are three likely explanations for the malseating of the prosthesis, any or all of which probably occurred during the surgery. First, the physicians did not take an accurate measurement of the left corpora. As a result, the cylinder component of the prosthesis inserted into plaintiff's left corpora was too large for the effective space, causing the prosthesis to become unseated. Second, the prosthesis was never properly seated in the proximal end of the penis, which also results in the prosthesis being too large for the effective space. Third, the physicians at the VA punctured or tore the portion of the tunica albuginea lateral to the location of the incision when they dilated the left corpora, essentially allowing the prosthesis to bulge out into the area of the tear.

Dr. Rotelli testified that the mismeasurement of the corpora, the malplacement

of the prosthesis, and the tearing of the tunica albuginea all constituted deviations from the standard of care. In addition, Dr. Rotelli stated that the VA physicians should have realized the prosthesis was not properly seated or was the wrong size after noticing the mild deviation to the right with inflation of the prosthesis. Their failure to reexamine the sizing and placement of the prosthesis at this point in the surgery was also a deviation from the standard of care.

Dr. Rotelli also testified on direct examination that the physicians at the VA deviated from the standard of care during the course of plaintiff's post-operative care. Specifically, Dr. Rotelli testified that the physicians deviated from the standard of care by inflating plaintiff's prosthesis during his post-operative visits to the Urology clinic. This opinion was based in large part on plaintiff's statement that he suffered extreme and excruciating pain, to the extent that he was crying, while the physicians inflated the prosthesis. Dr. Rotelli gave his opinion that it is a deviation from the standard of care to inflate a prosthesis when a patient is in such extreme pain because placing pressure on damaged nerve endings causes permanent damage to the nerve endings, resulting in permanent pain. Dr. Rotelli also testified that the prosthesis was overinflated during plaintiff's second post-operative visit to the VA on January 17, 1997, which further aggravated the nerves in plaintiff's genital area and led to the permanent pain of which plaintiff complains.

Defendant's expert witness, Dr. Morgentaler, provided an opposing view of the medical care and treatment rendered to plaintiff by the VA. Before forming his opinion, Dr. Morgentaler reviewed the medical records maintained by the VA and Dr. Rotelli, as well as the medical records maintained by the numerous physicians plaintiff has treated with for his back injury. Upon completing this review of plaintiff's medical records, Dr. Morgentaler determined that the VA physicians did not deviate from the standard of care during plaintiff's implant surgery or during plaintiff's post-operative care.

In determining that there was no deviation from the standard of care during the implant surgery, Dr. Morgentaler primarily relied on the three separate operative notes signed by Drs. Sigman, Wojcik, and Swanson and the operative report signed by Drs. Sigman and Swanson. Based on his review of these notes, and drawing from his own experience and expertise in performing inflatable penile implant surgeries, Dr. Morgentaler concluded that the corpora cavernosa were properly dilated and measured, that the prosthesis was properly seated, and that there was no rupture of the tunica albuginea during dilation.

Dr. Morgentaler testified that if a prosthesis is improperly sized or has not been placed in the corpora correctly, it will buckle out through the incision into the corpora. To ensure that the prosthesis is properly sized and inserted, it is the standard of care to check the appearance of the prosthesis after it is placed into the corpora. Dr. Morgentaler testified that this should be done while the prosthesis is both deflated and inflated. Based on the fact that the medical record shows the physicians checked the fit of plaintiff's prosthesis three times during the implant surgery, in both the deflated and inflated state, Dr. Morgentaler concluded that the implant was properly sized and inserted.

Likewise, if a surgeon were to tear the tunica albuginea while dilating the corpora, the prosthesis would buckle out of the tear. In any event, Dr. Morgentaler testified that it is nearly impossible to tear the lateral portion of the tunica albuginea

while dilating the corpora. The corpora are dilated in the proximal and distal directions. Thus, in order to tear the tunica while dilating the corpora, the surgeon would have to turn the dilator ninety degrees with enough force to tear the tunica, which is made of fairly resilient material. Furthermore, if the tunica had been torn, the area where plaintiff alleged the tear occurred would have been thickened by scar tissue, not thinned out, as was discovered during the removal surgery. Based on these facts, Dr. Morgentaler testified that there was no tearing of the tunica albuginea during the implant surgery.

Dr. Morgentaler also gave his opinion that the mild deviation to the right produced by inflation of the prosthesis was not indicative of improper sizing or malseating of the prosthesis. Dr. Morgentaler stated that "[i]t's a rare penis that is perfectly straight with erection." Dr. Morgentaler emphasized that a mild deviation to one side or the other is insignificant because placement of a penile prosthesis is not intended to improve the aesthetics of the penis, but to aid in sexual function. Accordingly, as long as the erection produced by inflating the prosthesis is adequate for penetration, a mild deviation to one side or the other is not a cause for alarm.

Because the operative notes and operative report all reflect that the sizing and placement of the prosthesis was done correctly, Dr. Morgentaler came to the conclusion that the bulge formed when the prosthesis became unseated followed the surgery, and that it healed in this position. Although it is impossible to determine what caused the prosthesis to become unseated in plaintiff's case, Dr. Morgentaler testified that it is not an uncommon occurrence.

Dr. Morgentaler also testified that when a patient presents with a bulge in his penis, there are two ways to address the bulge. One of these methods is to correct the bulge in a surgical procedure to revise the placement of the prosthesis. The other method is to inflate the prosthesis in an attempt to force the prosthesis back into place. Since inflating the prosthesis is much simpler than surgery, it is the standard of care to inflate the prosthesis when a patient presents with a bulge. Accordingly, when the VA physicians inflated plaintiff's prosthesis during his post-operative visits on December 27, 1996 and January 17, 1997, they were acting within the standard of care.

Dr. Morgentaler also testified that is not a deviation from the standard of care to inflate the prosthesis under these circumstances simply because the plaintiff is in pain. It is expected that the patient will be in pain for several weeks after the implant surgery; therefore, it is expected that the patient will be in pain when the prosthesis is inflated during any post-operative visits. Dr. Morgentaler stated that there is no risk of causing permanent nerve damage while inflating the prosthesis, regardless of whether or not the patient is in pain. If inflation is aborted because a patient is in pain, it is only out of kindness to the patient, and is not to avoid the risk of causing damage to the nerves. Furthermore, Dr. Morgentaler testified that it is not possible to overinflate the prosthesis because there is only so much fluid in the reservoir. Therefore, there is no risk of causing nerve damage to the penis through overinflation of the prosthesis.

■ After considering Dr. Rotelli's testimony and the testimony of Drs. Morgentaler and Sigman, this Court concludes that plaintiff has failed to establish any deviation from the standard of care by the VA physicians, either during the December 5, 1996 implant surgery, or during

plaintiff's post-operative care. There are two principal reasons for the Court's conclusion. First, it the opinion of this Court that Dr. Rotelli's expert opinion is entitled to decidedly less weight than that of Dr. Morgentaler. Second, this Court has serious questions concerning plaintiff's credibility, and as such, cannot accept his version of the events involved in this case. The Court will elaborate on each point in turn.

At the outset, the Court notes that Dr. Rotelli's experience in inflatable penile implant surgery is extremely limited. Dr. Rotelli estimated that only five to ten percent of his general urology practice is devoted to treating patients with erectile dysfunction. Since graduating from medical school in 1974, Dr. Rotelli has only performed about six inflatable penile implant surgeries. Although he could not recall the exact date of the last inflatable penile implant surgery he performed, Dr. Rotelli stated that it was sometime between 1985 and 1990. Furthermore, Dr. Rotelli has never been presented with a patient with a bulge in his penis following an implant surgery. In contrast, Dr. Morgentaler has performed somewhere between six hundred to eight hundred inflatable penile implant surgeries since 1988, not including the number of surgeries that he has supervised, while Dr. Sigman has performed approximately one hundred penile implant surgeries.

In addition to his lack of experience in performing inflatable penile implant surgeries, Dr. Rotelli also demonstrated that he is unfamiliar with the standard of care that applies following implant surgery. When he was asked during cross-examination to describe the standard of care with regard to whether the prosthesis should be kept in a deflated or inflated state post-operatively, Dr. Rotelli testified that it is the standard of care to keep the prosthesis in a semi-inflated state for four to six weeks following surgery. In fact, the standard of care is to keep the prosthesis in a deflated state. Otherwise, the fibrous capsule that forms around the components of the prosthesis following surgery will surround the prosthesis in its semi-inflated state and prevent it from fully deflating.

Dr. Rotelli also demonstrated that he is unfamiliar with the anatomy of the penis. He testified that Buck's fascia and the tunica albuginea are the same, when in fact they are not. While Buck's fascia is translucent, the tunica albuginea is an opaque white with longitudinal fibers that are visible to the naked eye. Dr. Morgentaler, Dr. Sigman, and Dr. Swanson all testified that Buck's fascia and the tunica albuginea are separate parts of the penis, which are easily distinguishable. Dr. Sigman testified that is a misconception to use the two terms interchangeably. Nevertheless, Dr. Rotelli testified that they "fuse as one unit." Trial Tr., June 13, 2001, p. 67.

Furthermore, Dr. Rotelli does not make an attempt to stay up-to-date on research in the field of urology. He does not belong to the American Urological Association or any other professional organization, does not participate in research in the field of urology, and is not involved in the medical academic community. In fact, Dr. Rotelli does not take even the simplest of steps to familiarize himself with recent advancements in the field of urology—he does not subscribe to medical journals. When asked to name three respected publications in the field of urology, Dr. Rotelli could only give the title of one such journal. A second journal he referred to simply as "the orange journal," referring to the color of the cover.

Another factor undermining the weight of Dr. Rotelli's testimony is that his opinion is based in large part on the facts as relayed to him by plaintiff. This is proble-

matic for two reasons. First, as will be discussed in greater detail below, plaintiff's version of the facts is unsupported by the record. Second, plaintiff did not give Dr. Rotelli a full medical history, neglecting to inform Dr. Rotelli that he had undergone four back surgeries and suffered from chronic back pain, and failing to give Dr. Rotelli a complete list of the pain medications he was taking. In fact, Dr. Rotelli has never reviewed any of plaintiff's medical records other than the VA records.

Finally, on cross-examination, Dr. Rotelli backed away from or reversed his opinion on key portions of his testimony. Dr. Rotelli conceded that, according to the operative report, there was no deviation from the standard of care during the surgery on December 6, 1996. He also agreed that it was not a deviation from the standard of care to close plaintiff with the mild deviation to the right. Dr. Rotelli admitted that he could not say, within a reasonable degree of medical certainty, that there was a tear in the tunica on December 6, 1996. He conceded that a prosthesis can bulge where this is no rupture or tearing of the tunica. Finally, Dr. Rotelli also admitted that he could not say when the prosthesis became unseated, stating on redirect that "it seems like it became malseated after the surgery. It could have been at the surgery, but I'm not sure. I can't be sure. At some point it became malseated, but I don't know exactly when." Trial Tr., June 13, 2001, p. 70. In addition, Dr. Rotelli admitted that his only basis for concluding that the physicians deviated from the standard of care during plaintiff's post-operative visits are plaintiff's statements that he was screaming in pain during the inflation of the prosthesis.

On this point, the Court returns to the issue of plaintiff's credibility. Simply put, this Court finds that much of plaintiff's testimony is incredible. In particular, the Court takes issue with plaintiff's testimony concerning a conservation which allegedly occurred between plaintiff and Dr. Swanson on the day after the implant surgery. According to plaintiff, Dr. Swanson entered his hospital room and told plaintiff that "they had a problem." Dr. Swanson allegedly explained to plaintiff that his penis would be a little longer than it had been before, and that as a result, it would now appear as if it had been circumcised. Plaintiff testified that he did not remember this conversation with Dr. Swanson until a couple of weeks before the bench trial began. On cross-examination, plaintiff admitted that he did not remember Dr. Swanson's statement when he first filed this lawsuit, did not remember it when he answered defendant's interrogatories, and did not remember it when he was deposed by defendant. It is this writer's opinion that plaintiff's recent contrivance, remembered just a few weeks before this case came to trial, is devoid of truth.

In other instances, plaintiff's version of the events is not supported by the record. For example, plaintiff claims that, following the implant surgery, he had to return to the VA every ten days to receive more painkillers. This is not reflected in plaintiff's chart or in the VA pharmacy's records. This Court does not believe that the pharmacy at the VA regularly hands out narcotic drugs without a prescription from a physician or without noting it in its own records. Thus, the Court concludes that plaintiff's testimony on this point is not credible.

In addition, plaintiff claims that during the inflation of his prosthesis at each of his post-operative visits to the VA, he was screaming in pain, in extreme agony, and with tears streaming down his face. Not only is this not supported by the notes in plaintiff's medical chart, it is contrary to the testimony of Dr. Tackett–McQuiston.

Dr. Tackett–McQuiston testified that she specifically remembered plaintiff's first post-operative visit to the VA because it was the first time that she had ever examined a patient with a bulge in his penis following penile implant surgery. She remembers noticing the bulge, bringing Dr. Sigman into the exam room, and performing the examination, which included inflating the prosthesis. Notably, however, Dr. Tackett–McQuiston does not recall that plaintiff was screaming or crying in pain during his physical examination. Dr. Tackett–McQuiston testified that if she had observed plaintiff in that type of pain, she would have stopped the examination so as not to cause plaintiff any additional pain. This Court finds Dr. Tackett–McQuiston to be an extremely credible witness, and therefore regards plaintiff's testimony about the extent of his pain as a gross exaggeration.

Finally, when testifying before other administrative or judicial bodies, plaintiff demonstrated that he has a selective memory with respect to his medical history and the specific cause of his symptoms. Currently, plaintiff has two claims pending before the Department of Labor, seeking benefits under the Longshoremen and Harbor Workers Act for his back injury as well as his lung condition. At a hearing held before the Department of Labor on September 11, 2000, plaintiff testified that he suffered from shooting pains in his lower back and buttocks area. He also testified that he could only sit for a period of twenty to thirty minutes without changing positions, and that this was a result of the pain in his lower back. However, plaintiff testified before this Court that his inability to sit for an appreciable length of time without changing positions was due to the pain in his genital area.

Plaintiff also has a claim pending before the Workers' Compensation Commission of Connecticut, relating to his employment at Electric Boat. Plaintiff was deposed in connection with that claim on June 25, 1999. During his deposition, plaintiff was asked to list all of his medical conditions. Plaintiff described his chronic back pain, lung cancer, and a heart condition, but did not disclose the constant pain in his genitals from which he allegedly suffers.

Overall, plaintiff's tendency to withhold information when he is testifying under oath and apparent lack of candor with this Court leads this Court to conclude that plaintiff is not a credible witness. As such, this Court cannot accept his version of the facts in this case. In addition, plaintiff's lack of credibility further undermines the testimony of Dr. Rotelli, who relied on the facts as relayed to him by plaintiff in forming his opinion in this case. This is especially true with respect to Dr. Rotelli's opinion that the VA physicians deviated from the standard of care in their post-operative care of plaintiff, because the sole basis for Dr. Rotelli's opinion was plaintiff's statement that he was in extreme pain during the inflation of his prosthesis.

Accordingly, this Court concludes that plaintiff has failed to prove that the physicians at the VA deviated from the standard of care during plaintiff's implant surgery or in providing post-operative care to plaintiff. Indeed, the Court is satisfied that the implant surgery was performed in accordance with the standard of care by Dr. Sigman and Dr. Wojcik, and that Dr. Swanson participated only as an observer and scrivener. Further, the Court is satisfied that the post-operative care provided to plaintiff was in accordance with the standard of care.

V. Conclusion

For the preceding reasons, this Court finds in favor of the defendant, the United

States of America. The Clerk shall enter judgment for the defendant forthwith.

It is so ordered.